**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **HARRIS COUNTY, TEXAS** | § | |
| *Plaintiff* | § | |
| **vs.** | § | |
| | § | |
| **TEXAS DEPARTMENT OF** | § | |
| **TRANSPORTATION; AND JAMES M.** | § | **CIVIL ACTION NO. 4:21-cv-00805** |
| **BASS, IN HIS OFFICIAL CAPACITY** | § | |
| **AS EXECUTIVE DIRECTOR OF THE** | § | |
| **TEXAS DEPARTMENT OF** | § | |
| **TRANSPORTATION** | § | |
| *Defendants* | § | |

## ORIGINAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     Harris County, Texas ("Harris County" or "the County") brings this civil action against the Texas Department of Transportation ("TxDOT"), and James M. Bass, in his official capacity as its Executive Director, for declaratory and injunctive relief pursuant to the provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et. seq.* and its implementing regulations, and Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303 ("§ 4(f)").

2.     This litigation arises from the Defendants' decisions to expand and widen Interstate Highway 45 ("I-45"), from south of downtown Houston north to Beltway 8, to remove the Pierce Elevated section of I-45, and to re-route I-45 to the east and north of downtown, together named the North Houston Highway Improvement Project ("NHHIP" or "the Project").

3.     Harris County files this lawsuit to challenge the actions of TxDOT—a state agency—and its officials in adopting a design and plan that ignored serious harms, disregarded the concerns of the communities impacted by the Project, and brushed off the numerous comments they received as part of their flawed EIS process.  The Defendants had already made their mind

about what they were going to do and then simply did it, running roughshod over the procedural requirements of NEPA, the substantive law of Section 4(f) and the APA's constraint on arbitrary and capricious decision-making.

4.    Harris County files this lawsuit because the NHHIP must be more carefully considered and designed to meet the diverse needs of the region's future, reflect the changing circumstances of altered work patterns and new transit initiatives, learn from the regions' past experience that wider freeways cause more traffic, not less, and without unnecessarily displacing hundreds of families and businesses.

5.    Harris County recognizes that transportation projects are essential to the region, but also maintains that it is time to re-imagine the traditional highway expansion projects in a way that will benefit everyone by allowing improved mobility for all modes of transportation–including cars, trucks, transit, bicycles, and pedestrians–addressing current safety concerns such as narrow shoulders and short merge lanes, while minimizing the right-of-way taken from people to do so.

6.    The NHHIP is a once-in-a-generation opportunity to improve our region's mobility, enhance our region's image, and advance economic opportunity, while enriching our quality of life and mitigating the worst impacts on low-income and minority neighborhoods from highway construction.

7.    By filing this lawsuit, Harris County does not seek to cancel or unduly delay the NHHIP because the County readily recognizes that the existing I-45 desperately needs improving. But the NHHIP must be undertaken in accordance with applicable law, including NEPA, § 4(f) and the APA.

# I.  JURISDICTION

8.      This action arises under NEPA, 42 U.S.C. § 4321 *et. seq.*, and its implementing regulations, particularly those of the Council on Environmental Quality ("CEQ") found at 40 C.F.R. § 1500 *et seq.* as well as those of the Federal Highway Administration ("FHWA"), 23 C.F.R. § 770 *et. seq.*, and under § 4(f) of the Department of Transportation Act, 49 U.S.C. § 303. Judicial review is sought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction). This Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 552, 701–706, for violations of, inter alia, the APA, NEPA, and § 4(f).

# II.  VENUE

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), (c)(2) and (e) because the location of the property where the proposed expansion of I-45 is to take place is located within this district, Defendants reside in the district maintaining offices at 7600 Washington Ave, Houston, TX 77007, and Harris County is a governmental entity in this district.

# III.  PARTIES

10.     Harris County, Texas is a body corporate and politic under the laws of the State of Texas.

11.     The Texas Department of Transportation is a government agency of the State of Texas and may be served at 125 East 11th Street, Austin, Texas 78701–2483.

12.     James M. Bass is sued in his official capacity as Executive Director of the Texas Department of Transportation and may be served at 125 East 11th Street, Austin, Texas 78701–2483.

## IV.    STANDING

13.    Harris County has significant interests at stake in this litigation, and as detailed below, the County has standing to seek redress of the specific concrete injuries it will suffer. The footprint of the NHHIP is entirely within Harris County. The Project will impact Harris County residents, businesses, neighborhoods, property owners, and commuters for generations to come.

14.    The County Commissioners (members of the County's five-person legislative body), County staff, and retained consultants devoted countless hours and resources to reviewing the Draft Environmental Impact Statement ("DEIS") and the Final Environmental Impact Statement ("FEIS"), both of which are documents prepared and issued by TxDOT (required by law) to describe the effects for the NHHIP on the environment. The County submitted comments on the DEIS and the FEIS. The Record of Decision ("ROD") issued by TxDOT does not adequately address the County's comments.

15.    After TxDOT's release of the DEIS, Harris County and the City of Houston conducted a months-long community and stakeholder engagement to seek the public's input and ideas for changes to TxDOT's proposals in the DEIS. This public input resulted in a new vision— which the County and the City submitted to TxDOT—that proposes an alternative way for TxDOT to accomplish many of the safety, flood mitigation, and other benefits of the NHHIP while retaining the freeway's current footprint as much as possible in Segments 1 and 2 to minimize its impact on existing homes, businesses, and communities. The new vision also provides for improved local connectivity and transit access, including implementing a voter-approved and funded plan for easing traffic congestion, the METRONext Moving Forward Plan.

16.    The alternative selected in the FEIS/ROD issued by TxDOT will have several adverse impacts on the residents and property of Harris County.  For example:

- It would displace 1,079 residential housing units and 344 businesses, resulting in the loss of significant tax base and revenues to the County.

- It will impede public access to the downtown Harris County Court complex.

- Real property owned by Harris County will be taken for additional right-of-way for the Project including, for example, the Harris County employee parking lot on Nance Street.

17.     Harris County has specific government interests at stake in this litigation including its responsibilities over air quality, water quality, flood control, roadways, and emergency management, among others. For instance, stormwater runoff from the expanded I-45 will increase flows in the bayous and drainage ditches of Harris County, and will carry increased loads of pollutants, both during construction, and after the Project is complete. The Project construction period will likely result in disruption of traffic flows, longer travel times, an increase on local street traffic, and increased air pollution levels along all segments of the expansion and re-routing.

18.     Harris County Pollution Control Services Department operates to protect the health and welfare of County residents through programs such as those that monitor and protect air quality. Harris County is a designated serious nonattainment area for the Environmental Protection Agency's ("EPA") 8-hour ozone 2008 standard, and marginal nonattainment area for the EPA's 8-hour ozone 2015 standard. This means that the EPA has found that areas in the County do not meet the national primary or secondary ambient air quality standards. Ozone forms at ground level when nitrogen oxides ("NOx") and volatile organic compounds ("VOC") combine in the presence of sunlight. NOx is found in car exhaust and VOC enters the atmosphere from evaporated gasoline from vehicles.

19.     Through the adoption of a resolution on August 11, 2020, Harris County launched its Vision Zero Initiative to reach zero traffic deaths or severe injuries by the year 2030, to be

achieved through the work of Harris County Engineering Department ("HCED") to integrate safe mobility in future transportation plans and projects.

20. Harris County oversees emergency management, and I-45 is a major hurricane evacuation route for the entire region. The Project construction period will span many hurricane seasons and may require Harris County to alter its existing evacuation plans.

21. Harris County coordinates and participates with other local governmental entities to oversee traffic and transit in the region, including through Houston Transtar and METRO, whose operations will be impacted by the NHHIP.

22. Harris County Toll Road Authority operates two toll roads—Beltway 8 and the Hardy Toll Road—that either directly connect to I-45 or are accessed from I-45 via Loop 610. These roads may experience altered traffic volumes during and after construction.

23. Harris County collaborates with the City of Houston and the Houston Parks Board to construct, maintain and fund portions of the Bayou Greenways network of hike-and-bike trails and parklands.

## V. BACKGROUND FACTS

### The Federal Highway Administration and TxDOT conduct initial studies and scoping

24. In January 2002, TxDOT's Houston District initiated a comprehensive transportation study of the area between I-45 and the Hardy Toll Road starting from Downtown Houston and continuing approximately 30 miles northbound towards The Woodlands and SH 242 in Montgomery County. The transportation study is referred to as the North-Hardy Planning Study and resulted in TxDOT publishing two Alternatives Analysis Reports in 2003 (one on the highway component), and one in 2004 (on the transit component).

25. TxDOT sent a project initiation letter regarding the start of the NHHIP to the Federal Highway Administration ("FHWA") in October 2006. FHWA became the lead agency for

the NHHIP for the purpose of environmental review and NEPA compliance, with TxDOT as the cooperating agency.

26.     In October 2011, FHWA and TxDOT published the Notice of Intent ("NOI") to prepare an Environmental Impact Statement ("EIS") for the NHHIP in the State and Federal Registers. 76 Fed. Reg. 65775 (Oct. 24, 2011); 36 Tex. Reg. 7043 (Oct. 14, 2011).

27.     In November 2011, FHWA/TxDOT held the first rounds of Cooperating and Participating Agency Scoping Meetings in which they accepted scoping comments from local agencies and the public. FHWA/TxDOT held three subsequent rounds of scoping meetings with local agencies and with the public between October 2012 and April 2015, accepting comments from these stakeholders.

### FHWA Delegates NEPA and Section 4(f) duties to TxDOT

28.     On December 16, 2014, TxDOT took over responsibility for NEPA and Section 4(f) compliance under a Memorandum of Understanding ("MOU") with the FHWA pursuant to 23 U.S.C. § 327(a)(2)(A) and (c). As a result, the same federal environmental and administrative law standards that would otherwise apply to federal agencies—such as FHWA—in this context apply to TxDOT. *See id.* § 327(a)(2)(C) ("A State shall assume responsibility under this section subject to the same procedural and substantive requirements as would apply if that responsibility were carried out by the Secretary."). Under the MOU, TxDOT became the lead agency for the NHHIP environmental review and TxDOT explicitly waived Eleventh Amendment immunity and consented to federal court jurisdiction for all the responsibilities undertaken pursuant to the MOU. On December 9, 2019, FHWA and TxDOT renewed the MOU for another five-year period.

29.     As detailed below, TxDOT has failed to fully comply with the procedural requirements of NEPA's environmental review, § 4(f) review, the CEQ's NEPA regulations, and FHWA's environmental review regulations in ways that significantly impaired the ability of the

public to participate and comment during the process. TxDOT has also failed to fully comply with the substantive requirements of NEPA's environmental review, § 4(f) review, the CEQ's NEPA regulations, and FHWA's environmental review regulations in violations of the laws and regulations.

**TxDOT releases the Draft EIS.**

30.　　In April 2017, TxDOT made its DEIS available for public review. TxDOT held two open houses and public hearings in May 2017 to present the DEIS and its (TxDOT's) proposed recommended alternative (purportedly based on the information gleaned from the DEIS), and to accept written and oral comments from the public. That same month TxDOT held a community meeting. The public comments that TxDOT received about the DEIS were overwhelmingly negative, consisting of 376 negative comments, 68 neutral comments, and only 25 positive comments.

31.　　Harris County Engineering Department joined the public by submitting detailed comments to TxDOT regarding the DEIS on July 2017. The HCED comments identified numerous design, access, connectivity and safety concerns at specific locations. The HCED identified County-owned properties that would be adversely impacted or occupied by the expanded NHHIP right-of-way. The comments also submitted examples of indirect impacts to the Harris County Courthouse and Criminal Justice Complex in north downtown Houston, including reduced access and freeway connectivity. Additionally, HCED identified deficiencies and omissions in the DEIS schematics that impaired the County's ability to fully understand the impacts from the proposed designs. The HCED commented that an existing hike-bike trail under Interstate Highway 69, which was constructed by Harris County and maintained by the City of Houston, would be eliminated or severely impacted. HCED requested that TxDOT replace it with an off-road hike-bike trail of equivalent access and connectivity.

**The Draft EIS omits entire categories of environmental impacts.**

32.      FHWA regulations require that a DEIS be signed by the lead agency and then released to the public only when it complies with all NEPA requirements. 23 C.F.R. § 771.123(g) (DEIS must comply with NEPA requirements).

33.      NEPA, and the FHWA and CEQ regulations clearly contemplate that a DEIS is a single document, which must include any appendices and technical documents at the time of its release to the public for comments.

34.      In the DEIS, TxDOT failed to include review or adequate discussion of numerous environmental impacts that a DEIS is required to include. TxDOT instead stated that these categories of impacts would be discussed in a series of draft technical reports and analyses to be released at a later date.

35.      Public comments on the DEIS complained that it omitted numerous important issues, including impacts to Section 4(f) park and historical resources, quantitative noise impacts, visual impacts, community and environmental justice issues, quantitative air quality analysis, and drainage and water resource impacts.

36.      TxDOT's DEIS was incomplete at the time of its release, during the comment period, and during the public meetings because it did not contain all the information required by NEPA and FHWA regulations. 40 C.F.R. §1502.9(a); 23 C.F.R. § 771.123(g).

37.      After the close of the DEIS commenting period, TxDOT released 12 individual technical reports and analyses—listed below—on five separate dates between June 20, 2018 and December 19, 2019, with the last one released *32 months after the DEIS was released*.

| Draft Technical Report | Draft Report Posted to Website | Comments due to TxDOT |
|---|---|---|
| Draft Biological Resources Technical Report (April 2018) | 6/20/2018 | 7/20/2018 |
| Draft Carbon Monoxide (CO) Traffic Air Quality Analysis (May 2018) | 6/20/2018 | 7/20/2018 |
| Draft Community Impacts Assessment Technical Report (December 2019) | 12/11/2019 | 2/7/2020 |
| Draft Cumulative Impacts Technical Report (December 2019) | 12/19/2019 | 2/7/2020 |
| Draft Hazardous Materials Technical Report (June 2018) | 2/15/2019 | 4/17/2019 |
| Draft Historical Resources Survey Report (March 2019) | 4/25/2019 | 6/25/2019 |
| Draft Indirect Impacts Technical Report (May 2018) | 6/20/2018 | 7/20/2018 |
| Draft Mobile Source Air Toxics (MSAT) Quantitative Technical Report (May 2018) | 6/20/2018 | 7/20/2018 |
| Draft Traffic Noise Technical Report (February 2019) | 2/15/2019 | 4/17/2019 |
| Draft Addendum 1 to Visual Impact Assessment Technical Report (July 2018) | 2/15/2019 | 4/17/2019 |
| Draft Water Resources Technical Report (January 2018) | 6/20/2018 | 7/20/2018 |
| Draft Waters of the United States Technical Report (January 2018) | 6/20/2018 | 7/20/2018 |

38.     TxDOT posted these 12 documents to its project website, each with a 30-day comment period. Predictably, TxDOT received significantly fewer public comments on these 12 documents. TxDOT cannot cure an incomplete DEIS through the later piecemeal release of the 12 draft documents.

**Harris County and the City of Houston solicit their own community and stakeholder input on the NHHIP.**

39.     On August 13, 2019, the Harris County Commissioners Court unanimously adopted a resolution setting nine specific benchmarks for all regionally significant transportation projects in the County and instructing all the branches of the County government to ensure these benchmarks are realized in the NHHIP.

40.     Beginning in the summer of 2019 and continuing through early 2020, Harris County and the City of Houston held a number of public workshops and meetings and posted an online survey. At these workshops, for 37 specific items, participants were encouraged to comment and

state their preference between the preferred alternative design proposed by TxDOT in its DEIS, and a wide range of alternative designs addressing traffic, flooding, property and connectivity issues. The workshops and online survey resulted in 559 public responses.

41.     For one of the 37 items—managed lane operations—the TxDOT DEIS preferred alternative received 0% support, while the four alternatives suggested by the City of Houston and the County received collectively 100% support. For another of the 37 items—ramps in the Southwest corner of Downtown—the TxDOT DEIS preferred alternative received 28% support. This was the highest level of public support for any of TxDOT's DEIS preferred alternatives. The results of the workshop and survey, as well as recommendations from the City of Houston and Harris County, were submitted to TxDOT.

**Voters approve the METRONext Moving Forward Plan.**

42.     On November 5, 2019, Harris County voters in the Metro service area approved the METRONext Moving Forword Plan ("METRONext"). METRONext is a comprehensive plan to improve and/or extend METRO's transit authority system and ease traffic congestion. It contains the following improvements or expansions:

- The creation of METRORapid, a new Bus Rapid Transit ("BRT"). For example, the BRT incorporates a transit route on I-45 to George Bush Intercontinental Airport and Greenspoint.

- The improvement of the METRO's Regional Express Network, which for instance includes two-way HOV lanes on I-45 North.

- The construction of METRORail Phase 3 and related parking facilities that connect the Green Line and Purple Line. The combined lines will be extended to William P. Hobby Airport. Additionally, the Green and Purple Lines will be extended to the City of Houston Municipal Courthouse.

- The improvements of the Bus Operations Optimized System Treatments (BOOST), the Signature Service and other METRO bus services.

- The overall enhancement of the system, involving route improvements, accessibility and usability improvements, and other improvements reducing barriers to the use by seniors, the disabled, and others.

- The construction of new facilities, which includes approximately 10 new or improved transit centers and 11 new or improved park-and-rides and parking facilities related to the rapid transit service.

43.     METRO has received $3.5 billion in bonding authority, which consists of federal grants and local funds, to move forward with this voter approved plan.

44.     However, since METRONext has been approved TxDOT has failed to fully address how it will be incorporated into the NHHIP.

**TxDOT provided a "Selected Alternative" for the NHHIP in the FEIS and ROD.**

45. TxDOT presented the alternative that was selected for the Project in the FEIS and ROD. The NHHIP selected alternative is divided into 3 different segments. Segment 1 is I-45 from Beltway 8 North to north of Interstate Highway 610 ("I-610") (North Loop). Segment 2 is I-45 from north of I-610 (North Loop) to Interstate Highway 10 ("I-10") [including the interchange with I-610]. Segment 3 is the Downtown Loop System [I-45, U.S. Highway 59/Interstate Highway 69 ("US 59/I-69"), and I-10]. Each segment is depicted on the following map and described in more detail below.



46. **Segment 1 (Green)**: Segment 1 widens the existing I-45 primarily on the west side of the roadway, which requires about 200 to 225 feet of new right-of-way ("ROW"). A new ROW on the east side is also required in part of Segment 1 between Crosstimbers Street and I-610. Thus, the total new ROW required for Segment 1 is about 246 acres.

47. Further, in Segment 1, the expansion includes 8 to 10 general purpose lanes (2 to 3 in each direction), 4 MaX lanes (2 in each direction), and 4 to 6 frontage road lanes (2 to 3 in each direction). However, between Tidwell Road and I-610 there will be 12 general purpose lanes (6 in each direction) to incorporate ramps and connections to and from I-610. The general-purpose lanes will be elevated over major cross streets.

48. **Segment 2 (Purple)**: The ROW required for Segment 2 will be taken from the east and west sides of I-45. About 44 acres of new ROW will be required for this segment.

49. In Segment 2 the expansion includes 10 general purpose lanes (5 in each direction), 4 MaX lanes (2 in each direction), and 4 to 6 frontage road lanes (2 to 3 in each direction). From north of Cottage Street to Norma Street, the general purpose and MaX lanes would be depressed.

50. **Segment 3 (Orange)**: Segment 3 would reconstruct all the existing interchanges in the Downtown Loop System and re-route I-45 to parallel I-10 on the north of Downtown and parallel US 59/I-69 east of Downtown. Downtown access on the west side would be provided through "Downtown Connectors" consisting of entrance and exit ramps for various Downtown streets. The Downtown Connectors would be depressed between W. Dallas Street and Andrews Street. The existing elevated I-45 roadway along west and south sides of Downtown would be removed. However, an option to leave I-45 (Pierce Elevated) between Brazos Street and US 59/I-69 in place is given but TxDOT is not funding any redevelopment or alternate use for such structure.

51. Portions of I-10 and US 59/I-69 would be re-aligned or straightened, removing the current curvature. Both I-45 and US 59/I-69 would be depressed in certain portions of the alignment east of Downtown. I-45 is also re-routed south of the George R. Brown Convention Center, where the highway begins to elevate tying into the existing I-45. US 59/I-69 would remain depressed towards Spur 527 and will be widened between I-45 and State Highway ("SH") 288. This section would widen US 59/I-69 to 12 general purpose lanes. US 59/I-69 would also be reconstructed between SH 288 to Spur 527 to 10 general purpose lanes.

52. The 4 purposed in Segments 1 and 2 would terminate and begin at Milam Street and Travis Street, respectively. I-10 express lanes are going to be located in the center of the general-purpose lanes within the proposed parallel alignment of I-10 and I-45 north of Downtown.

53. Additionally, a new ROW to the east of the existing US 59/I-69 along east Downtown would be needed to accommodate the re-alignment of I-45. A new southbound access road would be located adjacent to US 59/I-69 tying into the existing Hamilton Street on the south side of George R. Brown Convention Center. St. Emanuel Street would then serve as a northbound access road. About 160 acres would be needed for the new ROW for the I-10 and US 59/I-69 straightening and the construction of I-45 lanes adjacent to US 59/I-69 east of Downtown.

**TxDOT releases the FEIS and ROD, which fail to comply with NEPA, Section 4(f) and largely ignores the County's concerns.**

54. On September 25, 2020, TxDOT published a notice that the FEIS had been completed and was open for a thirty-day comment period. TxDOT extended the deadline for comments on the FEIS until December 9, 2020.

55. On December 9, 2020, Harris County provided comments to TxDOT on the FEIS for the NHHIP in the form of a letter from County Judge Lina Hidalgo (the County's Chief Executive) with attachments. The County comments submitted a proposed "new vision" for Segments 1 and 2 based on the community and stakeholder workshops and survey.

56. The County also identified inaccurate claims regarding the impacts of the alternatives identified in the FEIS, including impacts related to congestion, safety, and evacuation routes. The County comments showed that TxDOT eliminated reasonable alternatives from further analysis; that the traffic modeling and assumptions were unrealistic and ignored recent declining traffic numbers; that the FEIS removed discussions of certain adverse environmental impacts claiming instead that these would be mitigated by unsubstantiated and unfunded measures and downplayed other disparate impacts; and that the FEIS omitted critical information such as construction impacts, climate change, actual traffic trends, local street traffic impacts among others.

57. The County also noted that traffic volumes on I-45 have decreased since 2008. The FEIS projects that traffic volumes would rise 40% between 2015 and 2040, yet the data from the

first five years of the projection period show traffic volumes decreasing. The County commented that a more careful analysis of high-quality data was needed and that the FEIS did not demonstrate that the anticipated congestion on I-45 is an appropriate justification for this project. The County noted that research shows highway widening projects improve congestion only temporarily as a result of induced demand and that faster vehicle speeds do not necessarily improve overall safety, with some evidence suggesting the opposite.

58. The County commented that adding more lanes to the widest part of the I-45 will not help with emergency evacuation, because it will only act as additional storage space for motorists to queue or slow travel on an access-limited highway and I-45 eventually narrows to two lanes in each direction creating a bottleneck north of Houston. Relatedly, and without support, the FEIS claims that the NHHIP will not have significant impacts on local traffic.

59. The County asserted that TxDOT did not meaningfully consider any options without significant displacement impacts. During the initial round of screening alternatives, right-of-way impacts were considered for only the segment between Cavalcade Street and Quitman Street and all alternatives that did not add lanes were eliminated from further consideration.

60. Throughout the initial evaluation procedure, only a narrow set of alternatives was considered. For instance, all alternatives that did not add lanes to I-45 were disregarded without any additional consideration. As a result, TxDOT did not give meaningful consideration to alternatives that did not produce significant displacement impacts stemming from the added lanes to the highway.

61. The County noted that the FEIS lacks a critical discussion relating to the disproportionate impacts on minority and low-income populations and climate change impacts. The DEIS provided a detailed account of these impacts, but that account was not included in the FEIS. The FEIS and its alternatives favor white communities while disproportionately impacting

communities of color. Regardless of intention, the impacts of the Project would disadvantage low-income communities and people of color.

62.     The County commented on the extensive impacts the NHHIP will have on METRO bus service, the Wheeler Transit Center circulation, and Inner Katy park-and-ride routes. The FEIS mentions general impacts and mitigation regarding METRO transit services, but fails to recognize the impacts on these specific services and routes.

63.     Further, the County observed that while the FEIS includes several mitigation measures in response to previous comments,  its provides no adequate TxDOT funding source to implement those measures. The County noted that all mitigation claims in the FEIS must be funded as part of the NHHIP, and improvements that are not funded should not be claimed as mitigation. The FEIS fails to address this funding issue.

64.     Moreover, the County complained that FEIS does not acknowledge that the Bayou Greenways hike-bike trails are parkland or recreational facilities under § 4(f) of the Department of Transportation Act. As a result, no other alternatives, avoidance, or mitigation have been offered encompassing these parklands or recreational facilities.

65.     The NHHIP is an enormous endeavor and construction is predicted to last decades. However, the County noted that the FEIS provides no documentation of the impacts that will inevitably arise out of the decade-long construction. Consequently, TxDOT does not provide for mitigation of those construction impacts..

66.     Additionally, the County pointed out that the FEIS provided no documentation to support its claim that the NHHIP will have a positive impact on the region's economy.

67.     The County also provided comments regarding the Project schematics, the FEIS language, and certain stated commitments. Specifically, the County raised concerns with the discrepancies in the FEIS between project schematics, FEIS language, and stated commitments.

68.     TxDOT, FHWA and the U.S. Department of Transportation published a notice of final action on the NHHIP environmental review in the Federal Register on February 8, 2021. 86 Fed. Reg. 8828 (Feb. 8, 2021). This notice starts the 150-day statute of limitations for judicial review of the final agency action pursuant to 23 U.S.C. 139(l)(1).

69.     On March 8, 2021, the Texas Division of the FHWA wrote to TxDOT requesting that TxDOT pause further contract solicitation efforts for the NHHIP to allow the federal agency to allow the federal agency "time to evaluate the serious Title VI concerns" raised by complaints it received from the public and an elected official. FHWA retains Title VI of the Civil Rights Act of 1964 (which bars recipients of federal aid from discriminating against persons on the basis of race, color, and national origin) responsibilities over this project.

## VI.     CAUSES OF ACTION

70.     The facts set forth in paragraphs 1 to 69 are adopted herein.

### CAUSE OF ACTION NO. 1:
### THE DEIS VIOLATED NEPA AND ITS REGULATIONS BECAUSE IT WAS NOT A SINGLE DOCUMENT CONTAINING ALL THE REQUIRED INFORMATION UPON WHICH THE PUBLIC IS ENTITLED TO COMMENT

71.     NEPA requires that for each "major Federal action[] significantly affecting the quality of the human environment" the agency produce "a detailed statement by the responsible official on… the environmental impact of the proposed action…any adverse environmental effects,… alternatives to the proposed action…" and other information. 42 U.S.C. § 4332(C).

72.     NEPA and its implementing regulations require agencies to take a hard look at mitigation measures and at the direct, indirect, and cumulative impacts of proposed actions. 42 U.S.C. § 4332(C)(i)–(iii), (E); 40 C.F.R. §§ 1502.15(f), 1502.16, 1508.9(b), 1508.20, 1508.25(b)(3)–(c)(3). To meet this "hard look" requirement in an EIS, an agency must examine relevant data, articulate a satisfactory explanation for its action, and include a rational connection between the facts found and the choice made.

73.     CEQ regulations implementing NEPA require that "[t]he draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements in section 102(2)(C) of the Act." 40 C.F.R. § 1502.9(b). "If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion." 40 C.F.R. § 1502.9(b). "The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action." 40 C.F.R. § 1502.9(a). NEPA regulations also direct that agencies should, to the fullest extent possible, "encourage and facilitate public involvement" in the NEPA process. 40 C.F.R. § 1500.2(d).

74.     CEQ regulations specify in detail the contents and format of the draft and final EIS. 40 C.F.R. §§ 1502.10–1502.17. CEQ regulations allow the agency to prepare an appendix to an EIS containing "material prepared in connection with an environmental impact statement" and "material which substantiates any analysis fundamental to the impact statement." 40 C.F.R. § 1502.18(a)–(b). However, the CEQ regulations mandate that any such appendix shall "[b]e circulated with the environmental impact statement or be readily available on request." 40 C.F.R. § 1502.18(d).

75.     Under the MOU, TxDOT must fully comply with NEPA and its implementing regulations. TxDOT is not free to release a document claiming to be a DEIS, when on its face, it omits critical required information. In the FEIS, TxDOT states that each of the 12 draft technical reports were prepared for the final EIS. The information in the 12 later-released documents should have been included in the DEIS and made available to the public and other agencies at the same time. TxDOT did not hold any public meetings or hearings to solicit comments on any of the draft technical reports. In short, the DEIS published by TxDOT was simply incomplete and did not comply with NEPA or the applicable regulations.

76.     TxDOT's piecemealing of the DEIS impaired the ability of the public to fully understand the environmental impacts of the Project. The DEIS fails to comply with the full disclosure requirements of NEPA and in so doing, impeded public involvement and was therefore in violation of the law. 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.9(b); 5 U.S.C. § 706(2)(A).

**CAUSE OF ACTION NO. 2:**
**TXDOT VIOLATED SECTION § 4(F) OF THE DEPARTMENT OF TRANSPORTATION ACT BY IGNORING ITS ACTUAL USE AND CONSTRUCTIVE USE OF PARK AND RECREATIONAL RESOURCES**

77.     Segment 3 of the NHHIP would use, destroy, and adversely impair publicly owned Section 4(f) land by permanently impacting parkland, hike and bicycle trails, and recreational areas.

78.     The Department of Transportation Act, § 4(f) prohibits the TxDOT from using "publicly owned land of a public park, recreation area…of national, state, or local significance or land of a historic site." 23 U.S.C.S. § 138(a).

79.     Specifically, § 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, see also 23 U.S.C. § 138, imposes two major substantive requirements on federally funded highway projects pertaining to any publicly owned land from a public park, or recreation area of "national, State, or local significance." First, a project may not use such parkland, either by occupying or substantially impairing it, unless "there is no prudent and feasible alternative." 49 U.S.C. § 303(c)(1). Second, when a parkland site is "used," a highway project must include "all possible planning to minimize harm" to the site resulting from its use. 49 U.S.C. § 303(c)(2).

80.     Essentially, § 4(f) imposes an affirmative obligation on TxDOT to avoid the taking or use of parkland, such as the Bayou Greenways at White Oak Bayou and Buffalo Bayou.

81.     The Bayou Greenways 2020 project is transforming more than 3,000 acres of land along nine of Harris County's major bayous into linear parks with a connected 150-mile network of greenspace, with hike and bike trails.

82.	Harris County has provided funding to the Bayou Greenways 2020 as well as instructing Harris County Engineering Department and Harris County Flood Control District to dedicate their resources to the Greenways project.

83.	TxDOT recognizes that "open space" may be considered a Section 4(f) resource if the primary purpose of the property is for recreation. The FEIS, however, claims that the "greenways" within Segment 3 of the NHHIP do not qualify as open areas.

84.	TxDOT claims that the hike and bike trails along the various bayous in Segment 3 of the NHHIP are not parks, and thus are not § 4(f) resources. TxDOT concludes that the bayou "greenways" primary use is for drainage and flood control, and even if individuals may use the properties for recreation that use is secondary and incidental. According to TxDOT, therefore, the bayou "greenways" are not subject to Section 4(f) protection.

85.	TxDOT fails to acknowledge that the Bayou Greenways are parklands. TxDOT does not acknowledge that White Oak Bayou Greenway serves as a major urban park that will be significantly impacted.

86.	The White Oak Bayou Greenways will be severely impacted by the new elevated 28-lane, 700-foot-wide right-of-way obstructing the Downtown skyline views, burying portions of the greenway beneath new bridges, and decreasing the size of the greenway.


Downtown view from the White Oak Bayou Greenway trails.

87.     Apart from the direct use of parts of the Section 4(f) land described in the preceding paragraph, the NHHIP, Section 3 highway would, through its impact on noise levels, scenery, night-time lighting, and air emissions substantially impair the rural ambience of the parkland at White Oak Bayou Greenways and thereby "use," within the meaning of § 4(f) of the Department of Transportation Act, 49 U.S. § 303; *see also* 23 U.S.C. § 138, a substantial additional portion of the parkland.

88.     On the basis of the facts identified by the TxDOT and set forth in this Complaint, a "prudent and feasible alternative" addressing the direct and constructive use of the White Oak Bayou Greenways § 4(f) properties have not been evaluated or analyzed. TxDOT's refusal to consider alternatives that would not result in the actual or constructive use of parkland is exactly the type of action that § 4(f) prohibits.

89.     In the alternative, other methods for addressing traffic delays and congestion on I-45 and other existing highways might eliminate the need for some, or all highway expansion

encompassing this parkland and is therefore required by Section 4(f) as "planning to minimize harm."

90.     By proceeding with approval, funding and construction of Segment 3 the NHHIP in the face of possible opportunities to avoid expansion of the highway, TxDOT has failed to avoid direct and constructive use of, and/or has failed to use all possible planning to minimize harm to public parkland in violation of Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c); *see also* 28 U.S.C. § 138.

91.     By proceeding with approval and funding of the NHHIP, TxDOT's actions are in violation of Section 4(f) and is arbitrary, capricious or otherwise a violation of the law in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

**CAUSE OF ACTION NO. 3:**
**TXDOT VIOLATED NEPA BECAUSE ITS ALTERNATIVE ANALYSIS IMPROPERLY SCREENED OUT THE NO-LANE EXPANSION ALTERNATIVES AND DID NOT CONSIDER THE METRONEXT PLAN**

92.     NEPA requires an analysis of alternative methods of achieve the project purposes.

93.     According to the CEQ, the analysis of alternatives is the "heart" of the NEPA process. CEQ, *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, at No. 7 (1986).

94.     NEPA requires that an EIS "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). NEPA further requires that an EIS "devote substantial treatment to each alternative considered in detail so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14(b).

95.     In the NHHIP FEIS, the TxDOT failed to fully and adequately examine, analyze and disclose alternative courses of action required by NEPA and the CEQ regulations. Alternatives must be formulated in a manner that is unbiased and that provides sufficient design of the alternative in order to achieve the project purposes.

96.     In November 2019, voters approved the METRONext Moving Forward Plan. However, an alternative incorporating the voter approved METRONext Plan was not evaluated in the 2020 FEIS or the 2021 ROD.

97.     In the FEIS published in August 2020, the incorporation of the METRONext Plan was not seriously analyzed or evaluated as an alternative. According to the ROD, the Project will accommodate the current and future transit bus services, however, no specifics are provided on how the NHHIP will incorporate the METRONext Plan.

98.     In the comments that were submitted as part of the public review of the DEIS, numerous commenters requested further consideration of transit options to be incorporated into the NHHIP. In response to comments, TxDOT states that the METRONext Plan includes the use of the I-45 MaX lanes to accommodate planned METRORapid BRT system. However, no other aspect of the METRONext Plan is addressed, analyzed or evaluated. No attempt was made by TxDOT to fully and fairly represent this transit alternative.

99.     During the initial round of screening alternatives, right-of-way impacts were only considered between Cavalcade Street and Quitman Street. All other alternatives that did not add lanes were eliminated from further consideration. Therefore, TxDOT has not fully evaluated a wide range of alternatives for the NHHIP, nor has it considered any options that do not cause significant displacement impacts.

100.    NEPA requires an honest and objective screening of alternatives that fully discloses known information bearing upon the evaluation of alternatives. The evaluation of alternatives contained in the FEIS is inadequate and violates NEPA due to its failure to fully and fairly consider the transit alternative. 42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. §§ 1502.14; It was arbitrary and capricious and otherwise violated the law for TxDOT to publish a FEIS that lacks a full and fair evaluation of transit options. It was arbitrary and capricious and otherwise in violation of the law for

TxDOT to make a decision to go forward with the Preferred Alternative without making a full and fair evaluation of all alternatives. 5 U.S.C. § 706(2)(A).

**CAUSE OF ACTION NO. 4:**
**TXDOT VIOLATED NEPA AND FHWA REGULATIONS WHEN IT FAILED TO FULLY DISCLOSE NOISE IMPACTS AND TO IMPLEMENT THE REQUIRED MITIGATION MEASURES AND TAKE A HARD LOOK AT THE EFFECTIVENESS OF THE MITIGATION MEASURES**

101.     The FHWA regulations state that "[i]f a noise impact is identified, the abatement measures listed [23 C.F.R.] § 772.13(c) of this chapter must be considered." 23 C.F.R. § 772.11.

102.     NEPA and its implementing regulations require agencies take a hard look at measures to mitigate environmental impacts. Agencies must develop, discuss in detail, and identify the likely environmental consequences of proposed mitigation measures. 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1505.2(c); 1508.25(b)(3). An agency may not merely provide mitigation measures but also evaluate their effectiveness. Adequacy of mitigation measures must be supported by substantial evidence. Thus, agencies fail to take a hard look at mitigation measures when relying on unsupported, optimistic assumptions that mitigation will succeed.

103.     Noise levels predicted by TxDOT in the FEIS exceed 66 dBA at most locations along the proposed highway expansion project. Noise levels that equal or exceed 66 dBA are considered to create a noise impact.

104.     In the FEIS, TxDOT shows a noise impact to occur at 283 receptor locations along the proposed expansion project. However, the FEIS proposes a noise abatement barrier for only 205 out of the 283 receptor locations where noise levels were exceeded. The FEIS lacks any description of the types of impacts that would occur on those 78 locations for which noise abatement was not provided.

105.     Additionally, there are numerous residential receptors along the proposed highway expansion project that were not analyzed by TxDOT in the FEIS for noise impacts. In the FEIS, the

removal of the commercial buildings for the right-of-way acquisition was not considered in the analysis of the potential noise impact to residents located behind those commercial buildings. It is impossible for predicted noise levels to either stay the same or be reduced in an area where a highway is to be expanded significantly closer to residential properties, the expanded highway will remove commercial buildings in that area, and traffic volumes will increase in that area.

106. The FEIS failed to provide full and fair disclosure of the noise impacts arising from the proposed expansion of the I-45 Corridor in violation of the National Environmental Policy Act and FHWA regulations.

107. For additional noise mitigation in the FEIS/ROD, TxDOT unreasonably relies upon the impacted neighborhoods or receptors to request the noise mitigation. Even then, TxDOT will only construct the additional mitigation if approved by a vote of adjacent property owners. Furthermore, the noise impact mitigation measures are vague and lack a basis to conclude that many of the mitigation measures would be effective. The noise mitigation measures fail to consider the possibility that the measures may not prevent significant noise impacts.

108. TxDOT was arbitrary and capricious in preparing a FEIS that failed to fully and fairly disclose the noise impacts arising from the proposed expansion of the I-45 Corridor. 5 U.S.C. § 706(2)(A).

109. TxDOT was arbitrary and capricious in proceeding to a decision on the NHHIP without having full and complete information regarding the noise impacts of the proposed expansion on the residential areas adjacent to the expanded I-45 Corridor. 5 U.S.C. § 706(2)(A).

110. TxDOT failed to take a hard look at the effectiveness of the mitigation measures was arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations, 40 C.F.R. §§ 1508.25(b)(3), 1502.14(f), 1502.16(h), 1505.2(c), and the APA, 5 U.S.C. § 706(2)(A).

**CAUSE OF ACTION NO. 5:**
**TXDOT FAILED TO COMPLY WITH NEPA's FULL DISCLOSURE REQUIREMENTS**

111.    NEPA requires a federal agency to consider "any adverse environmental effects which cannot be avoided," 42 U.S.C. § 4332(2)(C)(ii), and to take a hard look at direct, indirect, and cumulative impacts from proposed actions. 40 C.F.R. §§ 1502.16, 1508.9(b), 1508.25(c). NEPA requires full and fair disclosure of health impacts of the proposed action as set out in the regulations of the Council on Environmental Quality. 40 C.F.R. § 1508.8.

112.    TxDOT has not fully and fairly disclosed all possible alternatives to minimize harm to the public parkland. The NHHIP can only use parkland if there is no prudent and feasible alternative. 49 U.S.C. § 303(c)(1). TxDOT has not fully evaluated the options or alternatives available to minimize harm to public parkland.

113.    TxDOT has also failed to fully and adequately examine alternative courses of action. Specifically, TxDOT failed to fully and fairly evaluate transit alternatives or alternatives that do not add lanes.

114.    Additionally, TxDOT has failed to fully and fairly evaluate the noise impacts caused by the NHHIP. For instance, the FEIS does not address how the potential noise impacts to residents located behind the commercial buildings being removed.

115.    Moreover, TxDOT has a duty under NEPA to disclose and evaluate the impact of the expansion of I-45 on ambient air quality. TxDOT has not evaluated the adverse health effects of the Project on the air quality either during or after construction, resulting in a lack of full disclosure. Likewise, TxDOT has a duty under NEPA to disclose and evaluate the impact of the Project on the water quality. Both the DEIS and the FEIS contain a generic analysis of the Project's impacts on the water quality. Specific and measurable water quality impacts and mitigation need to be established.

Thus, a full disclosure of the adverse health effects on the water quality impacts has not been provided.

116.     The FEIS does not fully and fairly disclose the impacts on drainage and floodplains. The drainage analysis for the Project is not complete because it does not account for the data available, nor does demonstrate that the NHHIP will cause more flooding.

117.     The FEIS states that the NHHIP is needed because population and economic growth will increase congestion on I-45. The FEIS also links congestion to safety issues, stating that "heavily congested areas are generally where more crashes occur." Yet, data from the first five years of the Project show traffic volumes decreasing. An analysis of higher-quality data is therefore needed to actually demonstrate the anticipated congestion on I-45. The FEIS lacks full disclosure of these issues. According to the traffic model presented in the FEIS, traffic volumes are projected to increase. However, the assumptions upon which the traffic model was based were not provided for review or scrutiny. Therefore, the FEIS does not provide full disclosure.

118.     Further, the FEIS fails to recognize, let alone analyze the impact of the Project on local streets and frontages roads. The lack of a detailed traffic analysis does not allow for a full and accurate assessment of the environmental, traffic, and accessibility impact of the Project, resulting in a failure to fully disclose under NEPA.

119.     The FEIS also does not provide any data, analysis or other information as to how the Project will help during an emergency evacuation. TxDOT states improvement of emergency evacuation for a motive to move forward with the NHHIP; however, it fails to provide a full and fair analysis on the matter.

120.     Moreover, the FEIS contains significant unsubstantiated mitigation claims. Several impacts outlined in the DEIS were removed, which demonstrates a significant flaw in the requirement of the FEIS to fully and fairly disclose mitigation measures for project impacts.

121. Similarly, TxDOT removed critical discussions related to the disproportionate impacts on low-income and minority populations and climate change from the FEIS. TxDOT, thus, has again failed to fully and fairly disclose impacts on low-income and minority populations and climate change impacts.

122. The FEIS does not even acknowledge the impacts that may arise during construction. TxDOT needs to address impacts on congestion or connectivity and provide mitigation measure, its failure to do so represents lack of full disclosure.

123. Lastly, the FEIS does not recognize the full extent of the impacts the Project will have on the transit system, including the bus lines, the light rail and Wheeler Station. Additionally, the FEIS does not analyze any alternatives that include the voter approved METRONext Moving Forward Plant. Thus, TxDOT fails to provide full disclosure of the impacts on the transit system.

124. The TxDOT's failure to take a hard look at the adverse impacts of the NHHIP, including all direct, indirect, and cumulative impacts, was arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations, 40 C.F.R. §§ 1502.16, 1508.7,1508.8, 1508.9, 1508.25, and the APA, 5 U.S.C. § 706(2)(A).

**CAUSE OF ACTION NO. 6:**
**A SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT IS REQUIRED DUE TO NEW INFORMATION & CHANGED CIRCUMSTANCES NOT FULLY CONSIDERED IN THE FEIS/ROD**

125. The CEQ regulations found in 40 C.F.R. Parts 1500 through 1508 are applicable to and binding all Federal agencies for implementing the procedural provision of NEPA. 40 C.F.R. § 1500.3.

126. These regulations state that such agencies "shall prepare supplements to either draft or final environmental impact statements if…there are significant new circumstances or information

relevant to environmental concerns and bearing on the proposed action or its imparts." 40 C.F.R. § 1502.9(c)(1)(ii).

127.    Additionally, these regulations state that if there is incomplete information, the agency must include such information if "the overall costs of obtaining such are not exorbitant, the agency shall include the information in the environmental impact statement."    40 C.F.R. § 1502.22(a).

128.    The DEIS and the FEIS fail to fully disclose significant impacts from this project. Significant new information and changed circumstances arose before the FEIS, and which TxDOT has refused to meaningfully consider.

129.    In 2019, Harris County voters approved the METRONext Plan. The FEIS failed to meaningfully incorporate or consider how the METRONext Plan will be integrated into the NHHIP.

130.    In 2020, the COVID-19 pandemic dramatically altered the region's traffic numbers, with significant numbers of daily commuters shifting to working from home. Many companies are making long-term or permanent changes to allow their employees to continue to work remotely full-time or for parts of the week.

131.    These changed circumstances were not meaningfully considered by TxDOT in the FEIS or ROD. 40 C.F.R. § 1502.9(b). Therefore, a supplemental EIS is required.

## VII.    RELIEF REQUESTED

Harris County respectfully requests that this Court enter a judgment in its favor, and:

1.    Declare that Defendants violated the APA and NEPA by failing to take a hard look at impacts resulting from the NHHIP, failing to evaluate all alternatives, failing to adequately respond to comments, and failing to make the full disclosures required by law;

2. Declare that Defendants failed to publish a full DEIS that complied with NEPA, that this failure resulted in the inadequate disclosure of all impacts, and impeded the ability of the public to participate in the NEPA process as required by law;

3. Declare that Defendants violated the APA and § 4(f) by refusing to identify the White Oak Bayou Greenway as a recreation or park land, and thereby failing to consider reasonable and prudent alternatives to its actual and constructive use for the NHHIP;

4. Harris County seeks a permanent injunction to vacate the ROD approving of the NHHIP, and remand it back to TxDOT for full and complete compliance with NEPA, its implementing regulations, and § 4(f); and

5. Grant Harris County such other relief as may be necessary and appropriate or as the Court deems just and proper.

March 11, 2021

Respectfully submitted,
IRVINE & CONNER PLLC

by: __/s/ Charles Irvine_____
**Charles Irvine**
*Attorney in Charge*
Texas Bar No. 24055716
Federal (Southern District) No. 675029
charles@irvineconner.com
**Janet Campos**
Texas Bar No. 24096157
4709 Austin St.
Houston, Texas 77004
713.533.1704


**Christian D. Menefee**
Harris County Attorney
Texas Bar No. 24088049
Federal (Southern District) No. 2800354
Christian.Menefee@cao.hctx.net
**Jonathan Fombonne**
Deputy Harris County Attorney
Texas Bar No. 24102702
Federal (Southern District) No. 3016436
Jonathan.Fombonne@cao.hctx.net

**Tiffany Bingham**
Managing Counsel
Texas Bar No. 24012287
Federal (Southern District) No. 1077536
Tiffany.Bingham@cao.hctx.net
by: ___/s/ *Sarah Jane Utley*___
**Sarah Jane Utley**
Environmental Division Director
Texas Bar No. 24042075
Federal (Southern District) No. 737952
Sarah.Utley@cao.hctx.net
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
(713) 274-5124 (direct line)
**ATTORNEYS FOR PLAINTIFF
HARRIS COUNTY, TEXAS**